UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DONAVAN MCKINLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| AARON PERKINS, in his individual | ) | **JURY TRIAL DEMANDED** |
| capacity; and CITY OF ST. LOUIS, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff Donavan McKinley, by and through counsel Evelyn C. Lewis, and for his cause of action against Defendants Aaron Perkins and City of St. Louis, states as follows:

## INTRODUCTION

1.     On or about December 18, 2016, Plaintiff Donavan McKinley was confined as a pre-trial detainee at the St. Louis City Justice Center (Justice Center).  Mr. McKinley was severely injured in the incident at issue in this case, as he was physically and sexually assaulted by two fellow detainees.  The assault was so brutal that the attackers were criminally charged, prosecuted and convicted in St. Louis City Circuit Court; and the main attacker has been sentenced to 15 years in the Missouri Department of Corrections for his role in the assault.

2.     At all times relevant to the events at issue in this case, Defendant Aaron Perkins was employed as a corrections officer at the Justice Center.  Defendant Perkins and Defendant City of St. Louis were required to protect Plaintiff from foreseeable harm while he was confined

at the Justice Center, including foreseeable harm from other detainees.  Thus, Defendants had a

duty to protect Plaintiff from the physical and sexual assault he suffered.

3.      The incident at issue was partially captured on audio-video surveillance; said

audio-video surveillance is incorporated herein by reference.  Said surveillance evidences that

Defendant Perkins was made aware that Mr. McKinley was about to be attacked by fellow

detainees before the actual assault took place.  Further, the video shows that Defendant Perkins

failed to protect Mr. McKinley from being attacked, and that he failed to intervene, or do

anything whatsoever for several minutes, to stop the attack once it started.

4.      Accordingly, pursuant to 42 U.S.C. Section 1983, Mr. McKinley brings this

action against Defendant Perkins for his acts and omissions that violated Mr. McKinley's rights

under the Eighth and Fourteenth Amendments to the United States Constitution.  Further, this

action is brought against Defendant City of St. Louis, pursuant to 42 U.S.C. Section 1983, for

implementing policies and engaging in practices and customs that have deprived Mr. McKinley

of his rights secured by the Eighth and Fourteenth Amendments to the United States

Constitution.

## JURISDICTION AND VENUE

5.      This cause is brought pursuant to 42 U.S.C. Section 1983.  The Court has

jurisdiction of this action pursuant to 28 U.S.C. Sections 1331 and 1343.   Also, the Court has

authority, pursuant to 42 U.S.C. Section 1988, to award Mr. McKinley his reasonable attorney's

fees, litigation expenses and costs.

6.      Venue is appropriate in this Court pursuant to 28 U.S.C. Section 1391(b).  All of

the incidents, events and omissions giving rise to this suit occurred in the Eastern District of

Missouri.  On information and belief, all Defendants are located in the Eastern District of
Missouri.

## **PARTIES**

7.      Plaintiff Donavan McKinley is a resident of O'Fallon, Illinois.

8.      At all times relevant to the events at issue in this case,  Mr. McKinley was
confined as a detainee at the Justice Center, a facility operated by Defendant City of St. Louis.

9.      At all times relevant to the events at issue in this case, Defendant Perkins was a
corrections officer employed by Defendant City of St. Louis.   Defendant Perkins is sued here in
his individual capacitiy only.  At all times relevant to the events at issue in this case, Defendant
Perkins was acting under color of state law and within the course and scope of his employment.
Upon information and belief, Defendant Perkins is a resident of the City of St. Louis, State of
Missouri.

10.     Defendant City of St. Louis is a municipal corporation, organized and existing
pursuant to Missouri law and located in the City of St. Louis, State of  Missouri.  Defendant City
of St. Louis is sued by virtue of its policies, practices and customs as described herein.

11.     At all times relevant to the events at issue in this case, each Defendant was the
agent of the other and was acting within the course and scope of this agency, and all acts alleged
to have been committed by any one of them was committed on behalf of every other Defendant.

## **FACTUAL ALLEGATIONS**

12.     On or about December 18, 2016, Donavan McKinley was being detained pending
trial at the Justice Center.  Darwin Stevenson (Stevenson) and Chaivez Bell (Bell) were also

detainees at the Justice Center at that time.  Mr. McKinley, Stevenson and Bell were all detainees of Cell Block 3-Charlie, also referred to as "3-C."

13.     On or about December 18, 2016, Mr. McKinley, along with several other detainees, was watching television in a common area of Cell Block 3-C, known as the dayroom. The dayroom is where detainees typically gather when they are not in their cells.

14.      While watching television, Stevenson became angry and hostile towards Mr. McKinley because Mr. McKinley stated it was rude for Stevenson to have the television channel changed by Defendant Perkins when other detainees were already viewing a program.

15.     Stevenson became very aggressive towards Mr. McKinley; he threatened Mr. McKinley by telling him "you're gonna suck my dick before the day is over."

16.     At the time this verbal altercation and threat took place, Defendant Perkins was present in the day room, as he was the corrections officer on duty for Cell Block 3-C at that time. Defendant Perkins was in earshot of the threat when Stevenson made it.  Defendant Perkins, being the corrections officer on duty, was responsible for monitoring the detainees' activities in the dayroom.  He was also responsible for monitoring the detainees' cells.

17.     Thus, Defendant Perkins was aware that Stevenson had aggressively confronted Mr. McKinley in the dayroom and had threatened to sexually assault him before the end of the day.

18.     Defendant Perkins was manning a stationary post where he could maintain a constant visual of the activity in the dayroom and the entrances to each cell on the block.  There was a computer and monitor at the stationary post which allowed Defendant Perkins to directly control the opening and closing of individual cell doors.

4

19.     After being threatened by Stevenson, Mr. McKinley left the dayroom in an effort to avoid a confrontation.  Mr. McKinley retreated to his cell, which was cell number 18, located on the upper level of cell block 3-C.

20.     Immediately after Stevenson verbally threatened Mr. McKinley, Stevenson walked past Defendant Perkins and went into his own cell which was located downstairs on the first level of  Cell Block 3-C.   As Stevenson walked pass Defendant Perkins, Stevenson called Defendant Perkins by name and gave him the following directive – "Perk, you don't hear nothing, you don't see nothing."  Stevenson gave this verbal order to Defendant Perkins at least twice.   This verbal command can be heard clearly on the audio-video surveillance recording of the incident.  Thus, Defendant Perkins was warned of the imminent nature of the attack and was put on notice by Stevenson that something was about to take place.

21.     Mr. McKinley has observed Defendant Perkins and Stevenson on prior occasions engaging in an unusual handshake when they greet each other.  On information and belief, Defendant Perkins and Stevenson are acquaintances with each other.

22.     After directing Defendant Perkins to basically look the other way, when Stevenson went into his own cell, he pulled his hair (long dreadlocks) up into a ponytail to prepare to attack Mr. McKinley.  Stevenson then walked back into the day room for a few seconds and then walked up the stairs which were located right next to Defendant Perkins' station.  Stevenson then entered Mr. McKinley's cell and proceeded to physically and sexually assault Mr. McKinley.

23.     Shortly thereafter, another detainee, Chaivez Bell, also entered Mr. McKinley's cell and joined in the attack.   As with Stevenson, Bell also walked directly past Defendant

Perkins and boldly went upstairs and entered the cell of Mr. McKinley.

24.     Defendant Perkins watched both Stevenson and Bell enter into Mr. McKinley's cell, yet he did nothing to intervene or stop them, nor did he request other officers intervene to assist Mr. McKinley.  Defendant Perkins had direct control over the opening and closing of Mr. McKinley's cell.  He allowed Stevenson and Bell to enter into Mr. McKinley's cell and stay there for several minutes.

25.     While inside Mr. McKinley's cell, Stevenson struck Mr. McKinley multiple times about the face, head and body.  At one point, Bell placed Mr. McKinley in a head lock as Stevenson attacked him.

26.     Moreover, while in the cell, Stevenson sexually assaulted Mr. McKinley in that he attempted to force Mr. McKinley to perform oral sex on him and tried to forcibly put his penis in Mr. McKinley's mouth.  Specifically, during the attack, Stevenson straddled Mr. McKinley, then lowered his pants and pulled out his penis.   Stevenson then began to thrust his hips toward Mr. McKinley and repeatedly poked his penis in Mr. McKinley's face as he attempted to shove his penis into Mr. McKinley's mouth.   Bell helped to hold Mr. McKinley down while Stevenson tried to force his penis into Mr. McKinley's mouth, as Mr. McKinley vehemently resisted.

27.     During the brutal attack, Mr. McKinley screamed loudly and repeatedly for help. The gut-wrenching screams are captured on the audio-video surveillance recording.

28.     Mr. McKinley's screams, along with the commotion from the assault, were so loud and disturbing that it caught the attention of practically all the detainees in the pod.  On the surveillance video, the detainees can be seen stopping all activities and looking up directly at Mr.

6

McKinley's cell from which the screams of pain and anguish were coming.  Still, Defendant Perkins did nothing.

29.     Defendant Perkins totally ignored Mr. McKinley's screams for help which were audible throughout Cell Block 3-C.  Defendant Perkins did not radio any other corrections officers for assistance; he did not immediately report the attack to any other officer on duty.  He did absolutely nothing to protect McKinley or to help him.

30.     Defendant Perkins, instead, heeded the instructions of Stevenson—he acted as though he didn't "see nothing or hear nothing."  He allowed Mr. McKinley to be beaten and sexually assaulted for **several minutes** without taking any action.

31.     Eventually, a third detainee Christopher Shead walked directly past Defendant Perkins, went upstairs and entered into Mr. McKinley's cell.  Shead tried to convince Stevenson and Bell to stop the attack.

32.     Eventually, Mr. McKinley, after biting Stevenson on his naked thigh, was able to break away from Stevenson and Bell and escape out of the cell onto the catwalk.

33.     However, as Mr. McKinley was trying to get away on the catwalk, he was assaulted again by Stevenson and Bell.  Mr. McKinley was struck so hard with blows to the face that the blows dropped him to the floor of the catwalk.  Mr. McKinley was knocked out cold for several seconds.

34.     Mr. McKinley suffered serious injury as a result of the attack including, but not limited to, a broken jaw, loss of a tooth, substantial loss of hearing in his right ear, permanent facial scarring due to surgeries, severe headaches, severe pain (face, back and body), and psychological injury including anxiety and depression.

**COUNT I**
**42 U.S.C. Sec. 1983--FAILURE TO PROTECT**
**(EIGHT AMENDMENT  and FOURTEENTH AMENDMENTS)**
**AGAINST DEFENDANT AARON PERKINS.**

35.     Plaintiff  repleads and incorporates each paragraph of this Complaint by reference as if fully restated herein.

36.     As a pre-trial detainee, Mr. McKinley was entitled to a presumption of innocence and Defendants were not allowed to engage in conduct which constituted punishment of Mr. McKinley for pending alleged charges.  All Defendants subjected Mr. McKinley to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

37.     All Defendants had an obligation to protect Mr. McKinley from harm and had to use reasonable effort to protect Mr. McKinley from attacks while he was detained in the Justice Center.

38.     All Defendants were deliberately indifferent to Mr. McKinley's safety and well-being and his right to be protected from being physically and sexually attacked by other detainees.

39.     As described more fully above in the factual allegations of this Complaint, Defendant Perkins knew there was a substantial and immediate threat of harm to Mr. McKinley. Defendant Perkins witnessed Stevenson become confrontational in the dayroom and threaten to sexually assault Mr. McKinley before the end of that day.  Immediately thereafter, Defendant Perkins was warned that Stevenson was getting ready to attack Mr. McKinley; Stevenson notified Defendant Perkins of the attack when he boldly told him "Perk, you don't see nothing, you don't hear nothing."   Upon hearing this warning from Stevenson, Defendant Perkins took

no action to protect Mr. McKinley from the foreseeable assault.   The threat against Mr. McKinley was imminent, but Defendant Perkins intentionally ignored it.   Defendant Perkins did not question Stevenson regarding the threat; he did not radio or summons other correctional officers to prevent the attack; he did not warn Mr. McKinley that another threat was just made by Stevenson; he did not lock the door of Mr. McKinley's cell when he saw Stevenson walking up the stairs to attack Mr. McKinley; he did not even order Stevenson to stop as he was headed to Mr. McKinley's cell.  He totally failed to protect Mr. McKinley.

40.     Again, Defendant Perkins, who had control over the opening and closing of the doors of the cells, allowed Stevenson and Bell to walk directly pass him, go upstairs, and then enter into Mr. McKinley's cell.  During the brutal attack, there were times when Defendant Perkins vacated the control desk.  Defendant Perkins, during the attack, totally ignored Mr. McKinley's repeated and loud screams for help.  Defendant Perkins failed to radio for help for Mr. McKinley, or to seek help for Mr. McKinley in any other manner.  Defendant Perkins failed to intervene in any manner to stop the attack.  Quite frankly, Defendant Perkins did absolutely nothing whatsoever to help Mr. McKinley.  He simply allowed Mr. McKinley to be physically and sexually assaulted for several long minutes.

41.     As a result of Defendant Perkins' unconstitutional conduct, Mr. McKinley was seriously injured and, consequently, suffered extreme physical pain and suffering and severe emotional distress.

42.     Defendant Perkins' conduct was done with deliberate indifference to Mr. McKinley's constitutional rights secured under the Eighth and Fourteenth Amendments to the U. S. Constitution to be free from cruel and unusual punishment while confined waiting for trial, which includes the right to be protected from being beaten and sexually assaulted by fellow

detainees.  Defendant Perkins showed deliberate indifference to Mr. McKinley's safety and well-being by his blatant and inexcusable failure to protect Mr. McKinley and his failure to intervene to stop the vicious assault against him.

43.     Defendant Perkins' conduct was intentional, wanton, malicious, oppressive and/or recklessly indifferent to the constitutional rights of Mr. McKinley and the rights of others, and, thus, entitles Mr. McKinley to an award of punitive damages against Defendant Perkins.

**COUNT II**
**42 U.S.C. Sec. 1983—FAILURE TO INTERVENE**
**(EIGHTH AMENDMENT and FOURTEENTH AMENDMENTS)**
**AGAINST DEFENDANT AARON PERKINS.**

44.     Plaintiff repleads and incorporates each paragraph of this Complaint by reference as if fully restated herein.

45.     When Mr. McKinley was being brutally attacked by Stevenson and Bell, Defendant Perkins failed to intervene in anyway whatsoever to stop the attack.  Instead, Defendant Perkins chose to totally ignore Mr. McKinley's repeated, gut-wrenching screams for help, which are disturbing and clearly captured on the audio surveillance.  Defendant Perkins failed to radio for help to rescue Mr. McKinley; he failed to walk or run to get help from other officers to stop the attack; he failed to walk or run up the stairs to order Stevenson and Bell to stop assaulting Mr. McKinley; he even failed to call out to Stevenson and Bell from his command post to order them to stop the attack.  In a nutshell, Perkins did nothing to stop the beating and the sexual assault that Mr. McKinley suffered.

46.     As a result of Defendant Perkins' unconstitutional conduct, Mr. McKinley was seriously injured and, consequently, experienced extreme physical pain and suffering and severe emotional distress.

47.     Defendant Perkins' conduct was done with deliberate indifference to Mr. McKinley's constitutional rights secured under the Eighth and Fourteenth Amendments to the U.S. Constitution to be free from cruel and unusual punishment while confined, which includes the right to receive assistance, aid, rescue and intervention when being physically attacked and sexually assaulted by fellow detainees.  Mr. McKinley could have been killed due to Defendant Perkins' inaction.  Defendant Perkins showed deliberate indifference to Mr. McKinley's safety and well-being by his blatant and inexcusable failure to intervene to stop the vicious assault that Mr. McKinley suffered.

48.     Defendant Perkins' conduct was intentional, wanton, malicious, oppressive and/or recklessly indifferent to the constitutional rights of Mr. McKinley and the rights of others, and, thus, entitles Mr. McKinley to an award of punitive damages against Defendant Perkins.

### COUNT III
### 42 U.S.C. Sec. 1983—MUNICIPAL LIABILITY
### (EIGHTH AND FOURTEENTH AMENDMENTS)
### Constitutional Rights Violations Resulting From Policies, Practices and Customs
### AGAINST DEFENDANT  CITY OF ST. LOUIS.

49.     Plaintiff repleads and incorporates by reference each paragraph of this Complaint as if fully restated herein.

50.     At all times relevant to the events at issue in this case, Defendant City of St. Louis had the responsibility of establishing, implementing and regulating the policies, practices and customs at the Justice Center.  Further, Defendant City of St. Louis had a duty to train, supervise, control and discipline its corrections officers at the Justice Center in relation to the facility's policies, practices and customs.

51.     At all times relevant to the events at issue in this case, in relation to the Justice Center operations, Defendant City of St. Louis had certain policies, practices and customs that were pervasive, accepted and widespread that resulted in Mr. McKinley's constitutional rights being violated.  These bad policies, practices and customs, which were commonly engaged in by employees and members of the Justice Center at all levels (including corrections officers, their supervisors, administrators and policymakers),  include the following:

a.      allowing detainees to roam about freely in the pod/cellblock irrespective of the detainee's known reputation for violence;

b.      allowing detainees to go freely from the lower level of a pod/cell block to the upper level (or vice-versa), even if the detainee's individual cell was on a level different than the one to which the detainee was going, even though such movement is in direct contradiction to written policy;

c.      allowing known violent detainees to have access to vulnerable detainees by housing vulnerable or targeted detainees with known dangerous detainees;

d.      allowing known violent detainees to have access to the cells of vulnerable detainees by failing to train, supervise, control and discipline corrections officers in relation to the following: securing the cell doors of detainees, monitoring who is entering a detainee's cell, and effectively operating the computerized opening/closing of cell doors;

e.      ignoring threats of harm that are communicated by a detainee against a fellow detainee, and failing to train, supervise, control and discipline corrections officers in relation to the proper course of action to take when a detainee has made a verbal threat against a fellow detainee;

f.      failing to have effective policies in place for intervening in assaults that are in progress when a detainee is being physically attacked by a fellow detainee, and failing to train, supervise, control and discipline corrections officers in relation to the proper course of action to take when intervention/assistance is needed to stop an assault that is underway;

g. failing to adequately staff the pods/cell blocks at the Justice Center, which have been chronically and severely overcrowded, so that enough security is prevalent to deter detainees from attacking other detainees and to have immediate assistance available in the event an attack takes place;

h. promoting physical violence among detainees by the practice of corrections officers intentionally granting detainees access and entry into the cells of a fellow detainee for the purpose of allowing a physical attack against the targeted detainee;

i. promoting physical violence among detainees by the practice of corrections officers directing and encouraging detainees to fight each other;

j. promoting physical violence at the Justice Center by the practice of corrections officers themselves engaging in acts of physical abuse against detainees, and failing to train, supervise, control and discipline corrections officers in relation to their acts of physical abuse against detainees;

k. failing to adequately discipline corrections officers who have engaged in misconduct, which thereby encourages more misconduct by other officers; and

l. failing to adequately investigate complaints of corrections officer misconduct, which is a failure to control and supervise corrections officers that leads to officers believing that they will not have to answer for their misconduct.

52. At all times relevant to the events at issue in this case, Stevenson and Bell were housed on the lower level of the cell block in question and Mr. McKinley was housed on the upper level of the block. But for the policies, practices and customs of Defendant City of St. Louis with respect to how they operate the Justice Center, Stevenson and Bell would not have been allowed to go upstairs to enter the cell of Mr. McKinley—a person Stevenson had minutes earlier threatened to sexually assault.

53. At all times relevant to the events at issue in this case, Defendant City of St. Louis had the power and responsibility to implement effective policies/practices relating to the security

13

of Mr. McKinley's individual cell.  The City of St. Louis had failed policies/practices in place

regarding the computerized opening and closing of cell doors at the Justice Center, which

ultimately allowed Stevenson and Bell to enter Mr. McKinley's cell and have access to him.  But

for this access and lack of appropriate security measures in place, Mr. McKinley would not have

been assaulted in his cell.

54.     At all times relevant to the events at issue in this case, Defendant City of St. Louis

customarily housed vulnerable detainees, like Mr. McKinley, in close proximity with known

violent and dangerous detainees like Stevenson.  Stevenson was a known member of the Crips

street gang.  It was known that Mr. McKinley was not a gang member.  Further, it was known

that Mr. McKinley was from out of state—Illinois; and that he was therefore a target of

Stevenson and fellow gang members who routinely targeted detainees from the metro-East,

Illinois area.  Despite having knowledge of these problematic housing conflicts, Defendant City

of St. Louis had no effective policy/practices in place to protect vulnerable detainees like Mr.

McKinley from being harmed by identifiably dangerous detainees like gang-member Stevenson.

55.     At all times relevant to the events at issue in this case, Defendant City of St. Louis

was responsible for the implementation and oversight of policies, practices and procedures

relating to appropriate steps to take in response to threats of imminent harm to detainees at the

hands of other detainees.   Defendant City of St. Louis had a practice of customarily ignoring

threats of harm made by one detainee against another.  Corrections officers did not take the

threats seriously and left the detainees to protect themselves in the face of the threats.  In this

regard, the policy of ignoring threats of imminent harm to detainees left victim detainees

unprotected against foreseeable and preventable physical assaults such as the one against Mr.

McKinley, of which Defendant Perkins was clearly warned.

56.     At all times relevant to the events at issue in this case, Defendant City of St. Louis had a duty to train, supervise and control the corrections officers at the Justice Center. Defendant City of St. Louis failed to ensure that the Justice Center corrections officers were adequately trained to (a) identify risks posed by dangerous detainees, (b) respond to threats made by detainees against fellow detainees,  (c) monitor and restrict the movement of detainees throughout the cell block, particularly when detainees are going from one level to another level, (d) control the opening and closing of individual cell doors in order to keep dangerous detainees from entering cells to carry out attacks, and (d) intervene with appropriate measures, including seeking backup assistance, to stop assaults that are in progress.

57.     As a result of its failed policies and practices that were in place during the attack of Mr. McKinley, no effort whatsoever was made by Defendant City of St. Louis, through Defendant Perkins or any other corrections officers on duty, to intervene to stop the attack.  Due to Defendant City of St. Louis' failed policies, procedures, and routine practices relating to how and when to intervene to stop a detainee from being beaten by fellow detainees, no one came to Mr. McKinley's rescue.

58.     At all times relevant to the events at issue in this case, the Justice Center has been chronically and severely overcrowded, as well as dangerously understaffed.  This problem has existed for years and Defendant City of St. Louis has not taken action to alleviate the problem. The surveillance video in this case shows no other corrections officer was present for several minutes except Defendant Perkins, when the cell block was full of countless inmates roaming freely.  In fact, the surveillance video shows Defendant Perkins actually leaving the control station at times, with no other corrections officer present to assist with any urgent matter that might arise.  The Justice Center was not adequately, properly and sufficiently staffed to handle

15

emergency situations such as the one at issue, where a detainee was attacked by fellow inmates. Due to the practice of understaffing the cell blocks (cell blocks full of known violent offenders), Mr. McKinley was seriously injured because no corrections officer other than Defendant Perkins was available to come to his rescue, nor was any summoned to the rescue during the attack in his cell.

59.     At all times relevant to the events at issue in this case, Defendant City of St. Louis' practice and custom of not supervising and disciplining its corrections officers for their misconduct has promoted and fostered a culture/climate at the Justice Center where corrections officers feel empowered to trample over the constitutional rights of the detainees.  It is a pervasive climate at the Justice Center whereby corrections officers have no fear of being disciplined or fired for their misconduct.  In this case, Defendant Perkins showed no fear of facing any discipline for allowing fellow inmates access to Mr. McKinley's cell and for blatantly ignoring the screams for help from Mr. McKinley.

60.     Through their policies, customs and practices, Defendant City of St. Louis has acted with deliberate indifference to the constitutional rights of Mr. McKinley, as well as others who are detained at the Justice Center.  Defendant City of St. Louis has acted with deliberate indifference to Mr. McKinley's Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment, which includes the right to be protected from being beaten and sexually assaulted by other detainees while awaiting trial.

61.     As a direct and proximate cause of the policies, customs, practices, actions and inactions of Defendant City of St. Louis, Mr. McKinley suffered serious injury, including severe pain and suffering and severe emotional distress.

62.     For many years, Defendant City of St. Louis has been alerted and aware that the policies, practices and customs implemented and engaged in at the Justice Center have failed to protect the safety and well-being of the detainees confined there. The Justice Center has failed as a facility in its operations and management.  The abuses at the facility are pervasive, numerous and continuous, and evidence a climate where detainees are left to fend for themselves against fellow violent detainees.  The attack against Mr. McKinley is not an isolated event; other detainees have been injured by fellow detainees.  Defendant City of St. Louis has been alerted through an abundance of lawsuits, claims and complaints relating to the abuse and neglect that is common place at the Justice Center.  Nevertheless, Defendant City of St. Louis has ignored the problems at the Justice Center for years and left corrections officers in place to regulate the facility as they saw fit with little oversight.  In doing so, over the years, Defendant City of St. Louis has exhibited continuous deliberate indifference to the constitutional rights of detainees.

63.     Regarding the systemic deprivation of constitutional rights that detainees at the Justice Center have suffered for years, even prior to the assault on Mr. McKinley, the numerous abuses are well-noted in a scathing, lengthy report prepared in 2009 by the American Civil Liberties Union of Eastern Missouri.  That report is entitled "Suffering in Silence:  Human Rights Abuses in St. Louis Correctional Centers."   On information and belief, at all times relevant to the events at issue in this case,  Defendant City of St. Louis was aware of the incidents of abuse that are described in said report.  The report shows that Defendant City of St. Louis had notice for years that its policies, practices and customs at the Justice Center, as well as the workhouse, were detrimental to the health, safety and well-being of the detainees housed there.  The abuses enumerated in the report are so numerous and pervasive that they paint a clear picture of how the climate at the Justice Center created the perfect storm for the attack against

17

Mr. McKinley in 2016.  The abuses at the Justice Center included, but are not limited to, detainees being assaulted by corrections officers, detainee assaults on other detainees, systemic cover up of incidents, false reporting, overcrowding, intimidation of whistleblowers, negligence resulting in death, medical neglect, squalor and other human rights violations.

64.     The specific problem of detainees being injured at the hands of other detainees in St. Louis City detention facilities expands well over a decade.  One tragic example of a detainee murdered at the hands of another detainee while confined at the Justice Center is the case of Michael Stevens.   On April 26, 2008, at age 49, Mr. Stevens was murdered in his cell at the Justice Center by a fellow detainee, Robert Francis.   Clearly, Defendant City of St. Louis failed to protect Mr. Stevens.   A more recent example of a detainee being seriously injured in his cell due to failed Justice Center policies/practices is the case of detainee Harold Mosley, Jr..  On July 15, 2017, Mr. Mosley was beaten so severely in his cell at the Justice Center by another detainee that the assault left him unconscious and near death in his cell.  Mr. Mosley was subsequently hospitalized in a coma due to the critical nature of his injuries.

65.     Additionally, regarding the violence against detainees at the hands of other detainees at the Justice Center, over the years and prior to the assault on Mr. McKinley, there have been well-documented reports and complaints of St. Louis City corrections officers engaging in a practice of making detainees engage in gladiator-style fights, whereby detainees are instructed and allowed to fight each other.  These are physical altercations between detainees that have been promoted by St. Louis City corrections officers.  In 2012, a federal lawsuit was filed against Defendant City of St. Louis regarding this practice.  The practice of encouraging detainees to attack each other in gladiator style fights shows the pervasive attitude that Defendant City of St. Louis has exhibited towards pre-trial detainees—an attitude of total deliberate

indifference to their safety and well-being.  Detainees simply have not mattered.  On information

and belief, at least two former St. Louis City corrections officers, Elvis Howard and Dexter

Brinson, were prosecuted on criminal charges in St. Louis City Circuit Court and entered guilty

pleas in 2012 in relation to coordinating fights between detainees.

66.     It is and has been, at all times relevant to the events at issue in this case, the

policy, custom and practice of the supervisors over the Justice Center to exert little, if any,

control over the corrections officers they supervise.  Instead, the culture there has been to allow

the individual corrections officers to deal with the detainees as they choose.  Over the years,

including prior to the assault on Mr. McKinley, there have been instances of corrections officers

themselves physically assaulting and even sexually abusing detainees at the Justice Center.  In

this regard, the corrections officers themselves actually promote a climate of violence at the

Justice Center by themselves engaging in assaultive behavior against detainees.  Some

corrections officers have been charged criminally and prosecuted for such misconduct.

67.     The attack against Mr. McKinley at the Justice Center took place in 2016.

Defendant City of St. Louis still has not corrected its bad customs, policies and practices in

relation to its operations at the Justice Center.  Since Mr. McKinley was beaten and sexually

assaulted in December of 2016, the operations at the Justice Center have been the subject of

numerous complaints and ground zero for pre-trial detainee injuries.   Just recently this year, on

or about March 22, 2021, a detainee at the Justice Center, Peter James Webb, was brutally

assaulted by two fellow detainees, reportedly after corrections officer Demeria Thomas opened

the victim detainee's cell and thereby allowed the attackers access to the victim detainee.  That

incident was captured on video surveillance; that video is incorporated herein by reference.  Like

Defendant Perkins, Officer Thomas had computerized control over the opening and closing of

19

the detainee's cell door via the stationary control podium she manned.  In that case, Officer

Thomas has been charged with a felony assault for her role in opening the cell door to allow the

attackers access to the victim detainee.  Like Mr. McKinley, that victim detainee suffered

multiple injuries including a broken jaw and a concussion.  That attack, like in the case of Mr.

McKinley's attack, lasted for several minutes without any intervention or effort from corrections

officers to stop the attack.  There is a clear pattern and practice here of St. Louis City corrections

officers abusing their authority by allowing detainees to be cruelly and unusually punished by

facing physical beatings in their cells at the hands of fellow detainees.

68.     Another recent example of another detainee's constitutional rights being violated

(while he was in his cell) as a result of an unsupervised, uncontrolled corrections officer at the

Justice Center is the case of the physical assault on detainee Ronnie Pope at the hands of

corrections officer Clifford Barringer.  Specifically, on or about May 19, 2020, Officer Barringer

assaulted Mr. Pope with a broom handle by repeatedly jabbing the broom handle in Mr. Pope's

chest while he was sleeping in his cell.  The entire incident was captured on video surveillance;

said video is incorporated herein by reference.  Officer Barringer had no fear of assaulting Mr.

Pope, even with video cameras rolling.  Officer Barringer, like Officer Perkins here, had no fear

of facing discipline because the policies of the Justice Center have encouraged poor treatment of

detainees and promoted reckless/willful indifference to their constitutional rights.

69.     Mayor Tishaura Jones, the newly elected mayor of Defendant City of St. Louis,

has publicly acknowledged in recent statements that the Justice Center has been operating and

managed under what she refers to as the "failed leadership" of former Corrections Commissioner

Dale Glass who resigned from the position on or about June 1, 2021.  Mayor Jones

acknowledged that Defendant City of St. Louis was left by Commissioner Glass "with a huge

mess to clean up" at the Justice Center.  Commissioner Glass was the chief policymaker over Justice Center operations when Mr. McKinley was assaulted there.  At all times relevant to the events at issue in this case, the widespread policies, practices and customs as set forth herein this Complaint were so well-settled as to constitute de facto policy at the Justice Center.  These practices have festered and flourished under the said failed leadership because for years the policymakers over the Justice Center, including Dale Glass, were deliberately indifferent to the constitutional rights of the detainees.

70.    Said policies, practices and customs described in this Complaint were able to exist and thrive because Defendant City of St. Louis was deliberately indifferent to the safety, health and well-being of its detainees.  In short, Defendant City of St. Louis violated Mr. McKinley's constitutional rights by maintaining policies and practices that were the moving force that drove the foregoing constitutional violations committed by Defendant Perkins when he chose to "hear nothing and see nothing," when he egregiously allowed Stevenson and Bell to assault Mr. McKinley.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Donavan McKinley respectfully requests this Court enter judgment in his favor and against all Defendants, jointly and severally, awarding the following relief:

A**.**    judgment for compensatory damages against all Defendants in an amount to be determined by a jury;

B.    judgment for punitive damages against Defendant Aaron Perkins in an amount to be determined by a jury;

C.    costs and attorney's fees against all Defendants; and

D.    such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff Donavan McKinley hereby demands a trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

DATED: August 13, 2021

RESPECTFULLY SUBMITTED,


/s/ Evelyn Lewis_____
Evelyn Lewis #43108
Law Office of Evelyn C. Lewis, LLC
Attorney for Plaintiff
7710 Carondelet Ave., Suite 200
Clayton, MO 63105
(314) 531-1000
(314) 932-1155 (Fax)
lewis@evelynlewisllc.com