**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| **DONAVAN MCKINLEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case No. 4:21CV1015 HEA** |
| | ) |
| **AARON PERKINS, in his individual capacity,** | ) |
| **and CITY OF ST. LOUIS,** | ) |
| | ) |
| **Defendants.** | ) |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant City of St. Louis' Motion to
Dismiss, [Doc. No. 6], Plaintiff's Motion for Leave to Amend Complaint, [Doc.
No. 19], and Defendant Perkins' Motion to Dismiss, [Doc. No. 21]. The Motion to
Amend will be granted.  The Motions to Dismiss will be taken as challenging the
Amended Complaint.  Defendant City of St. Louis' Motion will be granted.
Defendant Perkins' Motion will be denied.

### Facts and Background

Plaintiff's Amended Complaint alleges the following:

On December 18, 2016, Plaintiff was in pretrial detention at the St. Louis
City Justice Center. Darwin Stevenson (Stevenson) and Chaivez Bell (Bell) were
also detainees at the Justice Center at that time.  Plaintiff, Stevenson, and Bell were
all detainees of Cell Block 3-Charlie, also referred to as "3-C." Detainees

Stevenson and Bell were housed on the lower level of the cell block in question. Plaintiff was housed on the upper level of the block.

Detainee Stevenson was a known member of the Crips street gang. It was known that Plaintiff was not a gang member and that he was from out of state—Illinois; this therefore made him a target of Detainee Stevenson and fellow gang members who routinely targeted detainees from the Metro-East Illinois area.

Despite having knowledge of these problematic conflicts, Defendant City of St. Louis had no effective policy/practices in place to protect vulnerable detainees like Plaintiff from being harmed by identifiably dangerous detainees like gang-member Detainee Stevenson.

On December 18, 2016, Plaintiff was watching television in a common area of Cell Block 3-C, known as the dayroom. The dayroom is where detainees typically gather when they are not in their cells. While watching television, Detainee Stevenson became angry and hostile towards Plaintiff because Plaintiff stated it was rude for Stevenson to have the television channel changed by Defendant Perkins when other detainees were already viewing a program. Detainee Stevenson became very aggressive towards Plaintiff; he threatened Plaintiff by telling him: "You're gonna suck my dick before the day is over."

2

At the time this oral altercation and threat took place, Defendant Perkins was present in the day room. He was the corrections officer on duty for Cell Block 3-C during that time. Prior to the incident on December 18, 2016, Plaintiff observed Defendant Perkins and Detainee Stevenson on prior occasions engaging in an unusual handshake when they greet each other. Plaintiff believes Defendant Perkins and Detainee Stevenson are acquaintances. This information aligns with Detainee Stevenson's seemingly familiarity with calling a correctional officer by a nickname. This is reflected in the audio-video surveillance[1] of the incident where Detainee Stevenson calls the Defendant, "Perk" --- what appears to be a nickname or shorthand for the Defendant's last name.

Defendant Perkins was not only in earshot of Detainee Stevenson's threat, but Detainee Stevenson spoke directly to Defendant Perkins prior to undertaking the assault of Plaintiff. Defendant Perkins was aware that Stevenson had aggressively confronted Plaintiff in the dayroom and threatened to sexually assault him before the end of the day.

As the officer on duty, Defendant Perkins was responsible for monitoring the detainees' activities in the dayroom and the activities in their cells. Defendant Perkins was responsible for manning a stationary post that allowed him

---

[1] Plaintiff incorporates the Audio-Video surveillance by reference, however, Plaintiff has failed to provide the Court with the surveillance recording.  The Court, however, for the purposes of these motions, assumes the truth of the allegations of what is on the surveillance recording

to maintain a constant visual of the activity in the dayroom and the entrances to each cell on the block. A computer and monitor were at the post where Defendant Perkins was stationed which allowed him control of the opening and closing of individual cell doors.

After being threatened by Stevenson, Plaintiff left the dayroom to avoid a confrontation and retreated to his cell (Cell No. 18). Plaintiff's cell was located on the upper level of cell block 3-C.

Immediately after Detainee Stevenson orally threatened Plaintiff, Detainee Stevenson walked past Defendant Perkins and went into his own cell which was located downstairs on the first level of Cell Block 3-C.  As Detainee Stevenson walked past Defendant Perkins, Detainee Stevenson called Defendant Perkins by name and gave him the following directive – "Perk, you don't hear nothing, you don't see nothing." Detainee Stevenson gave this oral order to Defendant Perkins at least twice.  This oral command can be heard clearly on the audio-video surveillance recording of the incident.  The audio-video surveillance demonstrates that Defendant Perkins was warned of the imminent nature of the attack and had notice by Detainee Stevenson that something was about to take place. After directing Defendant Perkins to look the other way, Detainee Stevenson can be viewed taking the following actions on video surveillance:

a. detainee Stevenson went into his cell and pulled his hair into a ponytail;

b. he walked back into the day room for a few seconds;

c. he walked up the stairs that were located next to Defendant Perkins' station;

d. detainee Stevenson entered Plaintiff's cell, where he physically and sexually assaulted Plaintiff.

Shortly thereafter, another detainee, Chaivez Bell, also entered Plaintiff's cell and joined the attack. Detainee Bell walked directly past Defendant Perkins, walked upstairs, and entered the cell of Plaintiff with no intervention from Defendant Perkins.

Defendant Perkins can be observed on the video watching Detainees Stevenson and Bell enter Plaintiff's cell. Defendant Perkins does nothing to intervene or stop them. He does not direct either Detainee Bell or Stevenson to report back to their cells or the day room. He does not stop Detainee Stevenson to inquire what is meant by his words: "Perk, you don't hear nothing, you don't see nothing."

Defendant Perkins does not request other officers to assist upon hearing Detainee Stevenson's statement to him regarding impending action. Instead, Defendant Perkins allowed Detainees Stevenson and Bell to enter Plaintiff's cell and stay there for several minutes despite the loud sounds, cries for help, and other detainees in the C-block looking toward Plaintiff's room because of the distressed sounds.

While inside Plaintiff's cell, Detainee Stevenson struck Plaintiff multiple times about the face, head, and body. Detainee Bell placed Plaintiff in a head lock as Stevenson attacked him. While in the cell, Detainee Stevenson sexually assaulted Plaintiff. He attempted to force Plaintiff to perform oral sex on him; he tried to forcibly put his penis in Plaintiff's mouth by straddling him, lowering his pants, and pulling out his penis. Detainee Stevenson thrusted his hips repeatedly toward Plaintiff's face as he attempted to shove his penis into Plaintiff's mouth. While Plaintiff vehemently resisted, Detainee Bell assisted Detainee Stevenson in the assault by holding Plaintiff down while Detainee Stevenson tried to force his penis into Plaintiff's mouth.

During the attack, Plaintiff screamed loudly and repeatedly for help. His screams are captured on the audio-video surveillance recording. Plaintiff's screams, along with the commotion from the assault, were so loud and disturbing that it caught the attention of practically all the detainees in the pod. The commotion is reflected on the surveillance video; detainees can be seen stopping all activities and looking up directly at Plaintiff's cell from where the screams were coming.

As Plaintiff's screams are heard and other detainees are seen looking in the direction of the screams, Defendant Perkins is seen on the video ignoring Plaintiff's screams that were audible throughout Cell Block 3-C. Defendant

Perkins does not move toward the screams. He does not radio other officers or call for assistance. He says nothing. He does not look nor yell towards the direction of the screams to intervene. He does not immediately report the attack to any other officer on duty. Defendant Perkins does absolutely nothing to protect Plaintiff nor help him. Defendant Perkins, instead, heeded the instructions of Detainee Stevenson—he acted as though he didn't see or hear anything.  He allowed Plaintiff to be beaten and sexually assaulted for several minutes without taking any action.

Eventually, a third detainee Christopher Shead walked directly past Defendant Perkins, walked upstairs, and entered Plaintiff's cell. Detainee Shead tried to convince Detainees Stevenson and Bell to stop the attack. Only after biting Detainee Stevenson on his naked thigh was Plaintiff able to break away, free himself from Detainees Stevenson and Bell, and escape out of the cell onto the catwalk. As Plaintiff was trying to get away on the catwalk, he was assaulted again by Detainees Stevenson and Bell. Plaintiff was struck so hard with blows to the face that it dropped him to the floor of the catwalk and knocked him unconscious for several seconds.

Plaintiff suffered serious injury as a result of the attack including a broken jaw, loss of a tooth, substantial loss of hearing in his right ear, permanent facial

scarring due to surgeries, severe headaches, severe pain (face, back and body), and psychological injury including anxiety and depression.

Defendant City of St. Louis has jurisdiction and maintains operations over both the St Louis City Justice Center (herein, "CJC") and the Medium Security Institution, also known as "the Workhouse" (herein, "the Workhouse"). Detainees awaiting resolution of pending charges in the City of St. Louis can be detained in either Defendant's CJC or the Workhouse. At all times relevant to the events at issue in this case, Defendant City of St. Louis had certain policies, practices and customs that were pervasive, accepted, and widespread at both of its detention facilities, the CJC and Workhouse, that resulted in Plaintiff's constitutional rights being violated. These policies, practices, and customs were commonly engaged in by Defendant City of St. Louis' employees at all levels at the CJC and Workhouse (including corrections officers, their supervisors, administrators, and policymakers).  To that end, many of Defendant City of St. Louis' practices, policies, and customs at the CJC and Workhouse, of which Defendant was on notice, were documented in the 2009 ACLU Report. This report was published in 2009 and documented findings of concern at both the CJC and the Workhouse including: inmate assaults on other inmates directed by correctional officers, systemic cover up of incidents, failure to make reports, sexual misconduct, negligence resulting in death, questionable hiring and training, and

many more significant issues. While numerous incidents are cited in the seventy-

four-page report, some examples of this ongoing conduct of which Defendant City

of St. Louis was on notice include the following:

    a.  Violent physical abuse and beating of inmates at both the City Justice
Center and Medium Security Institution.3 This includes incidents
wherein correctional officers participate in beating detainees and/or
make no reports of beatings that take place, similar to Defendant
Perkins' failure to do so when Plaintiff was physically beaten
and sexually assaulted.

    b. Corrections officers interviewed also acknowledged that "sometimes
inmates are violently assaulted because of the intentional inaction
of a CO...Inmates get jumped and a CO will stand there and look." In
2016, seven years after the ACLU report was published, Defendant
City of St. Louis, have not changed its policies, customs, or practices.
This is substantiated by Defendant Perkins' willingness to stand by and
allow Plaintiff to be assaulted by Detainee Stevenson.

    c. Improper and substandard training of officers related to "direct
supervision, interpersonal communication skills, firearms, first aid and
CPR... no training beyond...passing out written policy to staff and
leaving them with it."

Additionally, other sources indicate Defendant City of St. Louis' notice of

these customs, practices, and policies, and evidence its failure to intervene to stop

these harmful customs and practices and its failure to properly train and supervise

its employees. Some examples of this ongoing conduct of which Defendant City

was on notice include the following:

    a. allowing detainees to roam about freely in pods/cellblocks irrespective of
a detainee's known reputation for violence and for purposes of allowing
violence; this piece from the Daily News reveals numerous inmates under
the jurisdiction of the Defendant who were placed in circumstances to fight

each other--- similar to the circumstances of Plaintiff.

b. failing to properly supervise inmates/detainees who are known for violence and/or mental health issues and following policy for suitable housing recommendations.

c. Failure to adequately respond or respond at all to emergency requests for assistance or requests for protection from detainees/inmates. For example, in 2008, Michael Stevens and Robert Francis were held at CJC. Both indicated they had mental health issues and were housed together. Robert Francis strangled Mr. Stevens. Other inmates called corrections officers for help, but there was no response. Stevens died.

d. allowing known violent detainees to have access to the cells of vulnerable detainees by failing to train, supervise, control and discipline corrections officers in relation to the following: securing the cell doors of detainees, monitoring who is entering a detainee's cell, and effectively operating the computerized opening/closing of cell doors;

e. The Defendant City of St. Louis' failures prior to Plaintiff's detention reflect its notice of unofficial customs that were harmful. To date, these same customs, policies, and practice remain in place with overcrowding which allows inmate violence, physical abuse of detainees by officers and amongst detainees. Defendant's failure to train, supervise, correct, and intervene encourages staff to continue these practices and customs and discourages discipline and investigation of misconduct.

f. In approximately 2018, a campaign, Close the Workhouse, was launched. This campaign spearheaded by local activists, highlighted much of what was discussed in the ACLU report nearly 10 years ago; physical assaults, abuses and correction officers' looking the other way continued to date.

Of note, while current and ongoing incidents occurred after Plaintiff was no longer a detainee of Defendant City, Defendant City remains on notice of the dangers of its unofficial customs and still fails to resolve these issues.

Dangerous attacks against detainees held at the CJC while in Defendant City's custody and the problem of corrections officers failing to intervene and/or protect detainees continue to be an issue.

## Standard of Review

A claim may be dismissed if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss, the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiff[ ]." *Stodghill v. Wellston School Dist.*, 512 F.3d 472, 476 (8th Cir. 2008). However, "the Court is not bound to accept as true a legal conclusion couched as a factual allegation." *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 796 (8th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Plaintiff need not demonstrate the claim is probable, only that it is more than just possible. *Id.*

In reviewing the complaint, the Court construes it liberally and draws all reasonable inferences from the facts in Plaintiff's favor. *Monson v. Drug*

*Enforcement Admin.*, 589 F.3d 952, 961 (8th Cir. 2009). The Court generally ignores materials outside the pleadings but may consider materials that are part of the public record or materials that are necessarily embraced by the pleadings. *Miller v. Toxicology Lab. Inc.*, 688 F.3d 928, 931 (8th Cir. 2012). Matters necessarily embraced by the pleadings include "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quoting *Miller*, 688 F.3d at 931 n.3). Plaintiff has incorporated in the operative complaint an audio video surveillance recording The Court considers this recording in ruling on this motion to dismiss.

## Discussion

**Defendant Perkins**

Plaintiff's 1983 claim alleges that Defendant Perkins—in his personal capacity—failed to protect Plaintiff from being attacked by other detainees. Defendant argues Plaintiff has failed to sufficiently allege enough to state a cause of action and that he is entitled to qualified immunity.

It is without question that correctional officials have a duty to protect pretrial detainees from violence at the hands of other prisoners. *See Holden v. Hirner*, 663 F.3d 336, 340–41 (8th Cir. 2011). "Pretrial detainee § 1983 claims are analyzed

under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment prohibition of cruel and unusual punishment." *Id.* at 341. "This makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007).

In order for a pretrial detainee to plead a Fourteenth Amendment claim for failure to protect, he must allege (1) that he was incarcerated under conditions posing a substantial risk of serious harm, and (2) that the defendant or defendants were "deliberately indifferent to the substantial risk of serious harm." *Chavero-Linares v. Smith*, 782 F.3d 1038, 1041 (8th Cir. 2015) (quotation omitted). To establish the second element, a plaintiff must allege that the defendant or defendants "were aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the defendant or defendants had drawn such an inference. *Id.* (quoting *Schoelch v. Mitchell*, 625 F.3d 1041, 1046 (8th Cir. 2010)). Stated another way, a plaintiff need allege that a jail official "acted or failed to act despite [his or her] knowledge of a substantial risk of serious harm." *Nelson v. Shuffman*, 603 F.3d 439, 447 (8th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). "The question of whether the official knew of the substantial risk is a factual one subject to demonstration in the usual ways,

13

including inference from circumstantial evidence." *Id.* (quotation omitted). Further, "a plaintiff is not required to allege and prove that the defendant ... specifically knew about or anticipated the precise source of the harm." *Id.* (quotation omitted).

Plaintiff has pled that he was incarcerated under conditions posing a substantial risk of serious harm. For example, he alleges that Defendant Perkins necessarily heard Detainee Stevenson's threat in the dayroom; Perkins had a familiar relationship with Detainee Stevenson; Stevenson apprised Perkins that Stevenson was about to do something that Perkins should allow by not "seeing or hearing" anything; allowed Detainee Stevenson to enter Plaintiff's cell; Perkins ignored Plaintiff's calls for help even though the entire cell block could hear Plaintiff's cries; failed to call for assistance during the attack on Plaintiff.  Plaintiff has therefore met the first element of his failure to protect claim against Defendant Perkins.

With regard to the second element, Plaintiff has also sufficiently alleged that Defendants Perkins was deliberately indifferent to this substantial risk of serious harm. The Court concludes that Plaintiff has sufficiently alleged that Defendant knew about the threat in the dayroom, that Stevenson intended to fulfill the threat and ordered Perkins to ignore whatever he heard and allowed Stevenson to enter Plaintiff's cell such that Perkins knew Plaintiff was under substantial risk of serious harm. *See Lenz v. Wade*, 490 F.3d 991, 995 (8th Cir. 2007) ("An obvious

risk of a harm justifies an inference a prison official subjectively disregarded a substantial risk of serious harm to the inmates").

Plaintiff has also sufficiently alleged that Defendant Perkins was deliberately indifferent to the substantial risk of harm to Plaintiff. The Amended Complaint states that that Defendant Perkins was on duty in C-Block.; that he was responsible for manning a stationary post that allowed him to maintain a constant visual of the activity in the dayroom and the entrances to each cell on the block; he was stationed at a computer and monitor that allowed him to control the opening and closing of individual cell doors but failed to take any action when Stevenson entered Plaintiff's cell. Plaintiff has therefore alleged that Perkins possessed knowledge of facts from which a reasonable person could infer that a substantial risk of serious harm to Plaintiff existed.

Defendant Perkins argues he is entitled to qualified immunity in regard to Plaintiff's Failure to Protect Claim. "Qualified immunity shields a public official from suit for civil damages when his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bernini v. City of St. Paul*, 665 F.3d 997, 1002 (8th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Granting a 12(b)(6) motion on the basis of the qualified immunity is only appropriate "when the immunity is established on the face of the complaint," *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1058

(8th Cir. 2013) (quotation omitted), meaning that the plaintiff "can prove no set of facts in support of [his constitutional] claims which would entitle him to relief." *Cent. Airlines, Inc. v. United States*, 138 F.3d 333, 334 (8th Cir. 1998) (quotation omitted). To determine whether Defendant Perkins is entitled to qualified immunity, the Court must determine (1) whether Plaintiff has alleged a deprivation of a constitutional right, and (2) whether the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

As the Court noted above, Plaintiff has sufficiently alleged that Defendant Perkins violated his Fourteenth Amendment rights by failing to protect him from violence at the hands of other prisoners. As previously referenced, it has long been established that the Fourteenth Amendment requires corrections officials to protect pretrial detainees from violence at the hands of other inmates. *See Holden v. Hirner*, 663 F.3d 336, 340–41 (8th Cir. 2011); *see also Walton v. Dawson*, 752 F.3d 1109, 1118 (8th Cir. 2014) ("There is no doubt the right at issue—a pretrial detainee's right to be protected from sexual assault by another inmate—is clearly established."); *id.* at 1120 ("Detainees are most vulnerable when asleep, and the Constitution guarantees a minimum right to sleep without legitimate fear of a nighttime assault by another detainee."); *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (applying the Eighth Amendment). The Court concludes that immunity is not established on the face of Plaintiff's complaint. Defendant's motion is DENIED

with respect to Plaintiff's failure to protect claims against Defendant Perkins in his personal capacity.

**City of St. Louis**

Now, Defendant City of St Louis argues Plaintiff's § 1983 failure to protect claim against it should be dismissed because Plaintiff has not pled that the violation of his Fourteenth Amendment right was caused by an official policy or custom.

To state a claim for relief against a local government under § 1983, *Monell v. Dep't of Social Services* requires a plaintiff plead a deprivation of federal constitutional or statutory rights caused either by the execution of a "policy statement, regulation, or decision officially adopted and promulgated by [the municipality's] officers," or by the municipality's execution of a custom "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690–691 (1978). The Amended Complaint asserts legal conclusions that the City of St. Louis promulgated an official policy of allowing prisoner abuse in the Judicial Center and the Workhouse.  Plaintiff includes references to outside sources such as television news reports and surveys conducted by special interest entities.  Plaintiff sets out events that have occurred after the incident involving Plaintiff and statements made by the newly elected Mayor of the City of St. Louis wherein the mayor calls for

reform, against overcrowding and poor conditions in the two correctional facilities, but he makes no factual allegations that such a policy existed.

In order to plead a deprivation resulting from an official custom, a plaintiff must allege (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation. *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).

The Amended Complaint fails to allege facts showing the existence of a continuing, widespread, and persistent pattern of conduct whereby correction officers allow brutal physical and sexual attacks on other pretrial detainees. Plaintiff states merely conclusions and inapplicable statements.

The *Monell* stalls in its attempted lift off as Plaintiff has failed to allege facts showing that the City's policymaking officials had notice of these failures and yet were deliberately indifferent toward the risks posed to inmates.

## Conclusion

Assuming the truth of the facts alleged in the Amended Complaint, as the Court must do in analyzing motions to dismiss, Plaintiff has satisfied the Rule

12(b)(6) requirements as to Defendant Perkins.  However, Plaintiff's claim against the City of St. Louis fails in that it relies on conclusions, speculation, and lack of facts establishing any custom, policy, or practice of the City of St. Louis to violate the constitutional rights of pretrial detainees.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Leave to Amend Complaint, [Doc. No. 19], is **GRANTED.**

**IT IS FURTHER ORDERED** that City of St. Louis' Motion to Dismiss, [Doc. No. 6], is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Perkins' Motion to Dismiss, [Doc. No. 21], is **DENIED.**

Dated this 11th day of July 2022.

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE